1  **REICH RADCLIFFE & HOOVER LLP**
   Marc G. Reich (SBN 159936)
2  mgr@reichradcliffe.com
   Adam T. Hoover (SBN 243226)
3  adhoover@reichradcliffe.com
   4675 MacArthur Court, Suite 550
4  Newport Beach, CA 92660
   Phone:  (949) 975-0512
5  Fax: (949) 208-2839

6  **LIFSHITZ & MILLER**
   Joshua M. Lifshitz (*Pro Hac Vice to be submitted*)
7  jml@jlclasslaw.com
   821 Franklin Ave., Suite 209
8  Garden City, NY 11530
   Phone: (516) 493-9780
9  Fax: (516) 280-7376

10  Attorneys for Plaintiff

11                  **UNITED STATES DISTRICT COURT**

12                  **NORTHERN DISTRICT OF CALIFORNIA**

13

14  DAVID STONE, Individually and On Behalf of All      Case No: 3:17-cv-7123
    Others Similarly Situated,

15          Plaintiff,

16  v.                                                  **CLASS ACTION COMPLAINT FOR
                                                        VIOLATIONS OF SECTIONS 14(A) AND
17  LESLIE Z. BENET, PAUL M. BISARO, J. KEVIN           20(A) OF THE SECURITIES EXCHANGE
    BUCHI, ROBERT L. BURR, ALLEN CHAO,                  ACT OF 1934**
18  MARY K. PENDERGAST, PETER R. TERRERI,
    JANET S. VERGIS, IMPAX LABORATORIES,               **Demand for Jury Trial**
19  INC., ATLAS HOLDINGS, INC., K2 MERGER
    SUB CORPORATION, AMNEAL
20  PHARMACEUTICALS, LLC,

21          Defendants,

22

23

24

25

26

27

28

Plaintiff David Stone ("Plaintiff") by and through his undersigned attorneys, brings this class action on behalf of himself and all others similarly situated, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Impax Laboratories, Inc. ("Impax" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Impax's website concerning the Company's public statements; and (d) review of other publicly available information concerning Impax and the Defendants.

## SUMMARY OF THE ACTION

1.      This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Impax against the Company and the members of the Company's board of directors (the "Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger of Impax with privately held Amneal Pharmaceuticals LLC, through Atlas Holdings, Inc. ("Holdco") and K2 Merger Sub Corporation ("Merger Sub") (the "Proposed Transaction").[1]

2.      On October 17, 2017, Impax announced it had entered into a Business Combination Agreement, dated October 17, 2017 (the "BCA"), among itself, Holdco, Merger Sub and Amneal Pharmaceuticals LLC, in connection with the Proposed Transaction.  Under the terms of the BCA, Amneal will own approximately 75% of the voting power of the new, publicly traded holding company, Amneal Pharmaceuticals, Inc. ("Amneal") and Impax's shareholders will own approximately 25% of the voting power.  However, there is no definitive offer price and Impax's public shareholders are left in the dark as to the true value of this deal.

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately April 24, 2015 to May 6, 2016; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

3.      Following the closing of the Proposed Transaction and a private sale of the combined company's common stock to certain institutional investors, including TPG Improv Holdings, L.P. ("TPG") and funds affiliated with Fidelity Management & Research Company ("Fidelity," together with TPG, the "PIPE Investors") pursuant to a purchase agreement, current Amneal Pharmaceuticals LLC members will own approximately 60% of the voting power of the outstanding shares of the combined company's common stock and the PIPE Investors will hold approximately 15% of the voting power of the outstanding combined company's common shares.

4.      On November 21, 2017, in order to convince Impax shareholders to vote in favor of the Proposed Transaction, the Board authorized Holdco to file a materially incomplete and misleading registration statement on Form S-4 with the SEC (the "S-4" or "Registration Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

5.      While Defendants are touting the fairness of the Proposed Transaction to the Company's stockholders in the S-4, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the S-4 incomplete and misleading.

6.      In particular, the S-4 is materially false and misleading and/or omits material information concerning, *inter alia*, the following: (i)  the terms and details surrounding any alternative indications of interest the Company solicited or received from other companies; (ii) the financial projections for Impax; (iii) the financial analyses performed by the Company's financial advisor, Morgan Stanley & Co. LLC ("Morgan Stanley"), in support of its fairness opinion; and (iv) the actual Merger Consideration.

7.      The Proposed Transaction has been unanimously approved by the Boards of Directors of Amneal and Impax, and is also supported by the management teams of both companies.  However, it is subject to the satisfaction of customary closing conditions, such as the receipt of regulatory approvals and Impax's shareholder approval.

8.      The Proposed Transaction is expected to close in the first half of 2018.

9.      It is imperative that the material information that has been omitted from the S-4 is disclosed to the Company's stockholders prior to the forthcoming stockholder vote so that they can

properly exercise their corporate suffrage rights. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 and Regulation G, 17 C.F.R. § 244.100.

10.    In addition to failing to conduct a fair and reasonable sales process, the Defendants agreed to certain deal protection provisions in the BCA that operate conjunctively to deter other suitors from submitting a superior offer for Impax.  Specifically, pursuant to the BCA, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish Amneal with the terms of any competing bid and confidentiality agreement; (iii) a matching rights provision which gives Amneal ninety six (96) hours to match any unsolicited superior acquisition proposal the Board receives, which the Board shall be required to provide the identity of the entity or person making such proposal and the material terms thereof; (iv) a provision that requires the Company to pay Amneal a termination fee of $45 million; and (v) a provision which may require the Company to reimburse Amneal expenses in connection with entering into the Proposed Transaction in an amount up to $15 million. These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Impax.

11.    Plaintiff seeks to enjoin Defendants from holding the stockholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Impax stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

12.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

13.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because, among other things: (i) the conduct at issue had an effect in this District; (ii) Impax's principal executive offices are located in this District; (iii) each of the Individual Defendants either resides in this District or has extensive contacts within this District; (iv) a substantial portion of the transactions and wrongs complained of herein, occurred in this District; (v) most of the relevant documents pertaining to Plaintiff's claims are stored (electronically and otherwise), and evidence exists, in this District; and (vi) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

**THE PARTIES**

15.     Plaintiff David Stone ("Plaintiff") is, and at all relevant times has been, a shareholder of Impax common stock.

16.     Defendant Impax Laboratories, Inc. ("Impax" or the "Company") is a Delaware corporation with its principal executive offices located at 30831 Huntwood Avenue, Hayward, California 94544.

17.     Defendant Leslie Z. Benet ("Benet") has been a director of the Company since 2001 and is the Chairperson of the Compensation Committee and a member of the Compliance Committee.

18.     Defendant Paul M. Bisaro ("Bisaro") has been a director, the President and Chief Executive Officer ("CEO") of the Company since March 27, 2017.

19.     Defendant J. Kevin Buchi ("Buchi") has been a director of the Company since November 23, 2016.

20.     Defendant Robert L. Burr ("Burr") has been a director of the Company since 2001 and is the current Chairman of the Board.  Defendant Burr is a member of the Audit and Nominating Committees.

21.     Defendant Allen Chao ("Chao") has been a director of the Company since 2010 and is the Chairperson of the Nominating Committee and a member of the Compliance Committee.

22.     Defendant Mary K. Pendergast ("Pendergast") has been a director of the Company since 2013 and is the Chairperson of the Compliance Committee and a member of the Nominating Committee.

23.     Defendant Peter R. Terreri ("Terreri") has been a director of the Company since 2003 and is the Chairperson of the Audit Committee and a member of the Compensation Committee.

24.     Defendant Janet S. Vergis ("Vergis") has been a director of the Company since 2015 and is a member of the Compensation and Nominating Committees.

25.     Defendants Benet, Bisaro, Buchi, Burr, Chao, Pendergast, Terreri and Vergis and collectively referred to herein as the "Individual Defendants."  Each of the Individual Defendants was a member of the Board at all pertinent times and participated in the decisions and conduct alleged herein.  By reason of their positions, each of the Individual Defendants had, and continues to have, an obligation to determine whether the Proposed Transaction is in the best interest of the Company's shareholders and maximizes shareholder value.

26.     Defendant Atlas Holdings, Inc. ("Holdco") is a Delaware corporation and a wholly-owned subsidiary of Impax.

27.     Defendant K2 Merger Sub Corporation ("Merger Sub") is a Delaware corporation and a wholly-owned subsidiary of Holdco.

28.     Defendant Amneal Pharmaceuticals LLC is a Delaware limited liability company.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

29.     Impax is a specialty pharmaceutical company that develops, manufactures, and markets bioequivalent pharmaceutical products that operates in two segments, Impax Generics and Impax Specialty Pharma. The Impax Generics segment provides generic pharmaceutical products directly to

wholesalers, retail drug chains, and others; generic prescription products through third-party pharmaceutical entities pursuant to alliance agreements; generic pharmaceutical over-the-counter (OTC) and prescription products to third parties; and generic pharmaceutical OTC products through third-party pharmaceutical companies pursuant to alliance agreements. The Impax Specialty Pharma segment focuses on the development, sale, and distribution through its specialty sales force of proprietary brand pharmaceutical products for the treatment of central nervous system disorders, including migraine, multiple sclerosis, Parkinson's disease, and post-herpetic neuralgia, as well as other select specialty segments.  The Company markets and sells its products to drug wholesalers, warehousing chain drug stores, mass merchandisers, and mail-order pharmacies in the continental United States and the Commonwealth of Puerto Rico.

### The Company Reports Strong Financial Results

### Prior to the Announcement of the Proposed Transaction

30.    On August 11, 2017, Zacks Equity Research published an article[2] concerning Impax's second quarter 2017 financial results, which stated, in pertinent part:

**Impax Laboratories (IPXL) Q2 Earnings Beat, Revenues Up Y/Y**

**Impax Laboratories Inc.**'s IPXL shares have risen almost 10% since it announced robust results on Aug 9. The company reported second-quarter 2017 adjusted earnings of 18 cents per share, beating the Zacks Consensus Estimate of 14 cents. However, earnings were down 14.3% from 21 cents in the year-ago period due to higher costs.

***Total revenue increased 17.1% year over year to $202.1 million on growth in Generic division sales.***

Revenues also surpassed the Zacks Consensus Estimate of $196.14 million in the reported quarter.

---

[2] Zacks Equity Research, *Impax Laboratories (IPXL) Q2 Earnings Beat, Revenues Up Y/Y* (Aug. 11, 2017),  *available  at*  https://www.zacks.com/stock/news/271721/impax-laboratories-ipxl-q2-earnings-beat-revenues-up-yy.

In fact, year to date, ***Impax shares are up 37.4%, while the industry declined 17.3%.***



### Quarter in Detail

During the reported quarter, Impax Generic division revenues increased 24% from the year-ago quarter to $150.8 million. The increase in revenues was due to higher sales of epinephrine auto-injector, oxymorphone ER and products acquired from Teva Pharmaceuticals Industries Ltd. TEVA and launch of generic version of Merck & Co., Inc's MRK Vytorin this quarter.

The Impax Specialty Pharma division recorded revenues of $51.2 million, up 26.7% year over year, largely due to higher sales of Rytary. However, Zomig sales were down 7% to $12.3 million.

Adjusted research and development (R&D) expenses grew 6.2% to $22.1 million in the reported quarter.
Adjusted selling, general and administrative expenses (SG&A) increased 17.9% to $51.2 million.

### Other Details

Subsequent to the quarter, in July, the company received approval for generic versions of Focalin XR (25 and 35 mg) and Concerta (18, 27, 36 and 54 mg) from the FDA. The approval of generic Focalin XR complemented its portfolio of generic Focalin XR, which included 5, 10, 15, 20 and 30 mg capsules. These are already marketed.

In April, Impax announced it that it has received final FDA approval for a generic version of Vytorin (ezetimibe/simvastatin tablets), 10/10, 10/20, 10/40 and 10/80 mg, and immediately initiated commercialization activities of this first-to-market opportunity.

Toward the end of March, the company had announced that the U.S. District Court, District of Delaware ruled in favor of it and AstraZeneca plc AZN in a patent infringement case regarding the generic version of Zomig.

### 2017 Outlook Updated

The company expects its full-year adjusted earnings to be in the range of 55 cents to 70 cents per share.

The company expects adjusted gross margin in the range of 47% to 49%.

Adjusted research and development expenses, including patent litigation expenses, across the generic and brand divisions are forecast to be in the range of $93 million to $97 million (previously $90 million to $95 million).

Adjusted selling, general and administrative expenses are expected to be in the range of $190 million to $195 million.

(Emphasis added).

### The Flawed Process Leading to the Proposed Transaction

31.     On March 3, 2017, the Board met with Morgan Stanley, its financial advisor, and Sullivan & Cromwell, outside counsel, to discuss Impax as a stand-alone company, as well as the exploration of strategic alternatives.

32.     On March 27, 2017, the Board appointed Paul M. Bisaro ("Bisaro") as its new CEO.

33.     On April 5, 2017, a representative of J.P. Morgan, Amneal's financial advisor, contacted Bisaro about a potential business combination involving Impax and Amneal.

34.     On April 6, 2017, Bisaro met with certain members of the Board concerning several business opportunities for Impax that warranted further exploration, including the Amneal opportunity.

35.     On April 12, 2017, Impax and Amneal entered into a confidentiality agreement, which included, among other things, reciprocal confidentiality and non-use obligations to apply in respect of any confidential information that would be disclosed by and between Impax and Amneal in connection to any upcoming discussions in relation to, and the evaluation of, any potential business combination.

36.     On April 17, 2017, Bisaro, Bryan Reasons ("Reasons"), Impax's Chief Financial Officer ("CFO"), and another member of Impax management, with a representative of Morgan Stanley, met with Chirag Patel, Chintu Patel and representatives of Tarsadia Investments ("Tarsadia"), who represent a significant group of investors in Amneal, to discuss a potential transaction.

37.     On April 29, 2017, Bisaro met with Chirag Patel about a potential business combination and expressed his view that any equity split should be 70% for Amneal members and 30% for Impax shareholders. Chirag Patel expressed his view that the split should be approximately 80% ownership for Amneal and approximately 20% ownership for Impax shareholders.

38.     On May 17, 2017, Impax provided an initial term sheet to Amneal with an equity split of approximately 67% ownership for Amneal and approximately 33% ownership for Impax stockholders.

39.     On May 26, 2017, Impax engaged Morgan Stanley as its financial advisor.

40.     On June 8, 2017, Impax's management met with Chirag Patel, Chintu Patel and members of Amneal management and representatives of Tarsadia, to continue discussions regarding the equity split and the governance issues proposed by Impax.

41.     Throughout June 2017, Impax entered into confidentiality agreements with other potential parties for a strategic transaction referred to as "Party B," "Party C," and "Party D."

42.     On June 22, 2017, Amneal sent a respond to Impax that set forth the following proposals, among others: for Amneal to be able to control of board of directors of the combined company, consisting of seven directors nominated by Amneal Holdings LLC, two directors nominated by the Impax stockholders and one independent director; for Bisaro to serve as CEO; for Chirag Patel to serve as chairman of the board; for a six-month lock-up period; and for the customary standstill.

43.     On August 1, 2017, Amneal and Impax granted each other access to their virtual data rooms for due diligence purposes.

44.     Throughout August 2017, Impax's Board authorized Bisaro to continue discussions with Amneal concerning a potential strategic combination.

45.     On August 31, 2017, Shanghai Fosun Pharmaceutical (Group) Co., Ltd. ("Shanghai Fosun") filed a Schedule 13G with the SEC, disclosing a 5.19% interest in Impax.

46.     On September 1, 2017, Impax's management, along with its financial and legal advisors, met with Chirag Patel, Chintu Patel and Amneal's management, and its financial and legal advisors, and the parties tentatively agreed upon an equity split of approximately 75% ownership for Amneal and approximately 25% ownership for Impax in any combined company.

47.     On September 11, 2017, the Impax Board met with Sullivan & Cromwell and Morgan Stanley regarding the terms of a potential combination.  The Board discussed whether it would be advisable to initiate an auction process to explore strategic transactions available to Impax.

48.     Throughout September 2017, Impax's and Amneal's legal advisors exchanged drafts and revisions of the BCA.

## The Company Announces the Proposed Transaction

49.    On October 17, 2017, the Company issued a press release announcing the Proposed

Transaction, which stated, in pertinent part:

**Amneal And Impax To Combine**

BRIDGEWATER, N.J. and HAYWARD, Calif., Oct. 17, 2017 /PRNewswire/ -- Amneal Pharmaceuticals LLC and Impax Laboratories, Inc. (NASDAQ: IPXL) today announced that they have entered into a definitive business combination in an all-stock transaction. As a result of the transaction, Amneal Holdings members will own approximately 75% and Impax shareholders will own approximately 25% of the new company's pro forma shares on an as converted basis.

The combined company, to be named Amneal Pharmaceuticals, Inc., will have a robust generics business that will rank as the 5th largest in the United States by gross revenue and a growing, high-margin specialty franchise. The combined company is expected to have 2018 pro forma adjusted EBITDA of approximately $700 million to $750 million, which includes expected significant cost-savings within the first full year of close. In addition to its broad existing commercial product portfolio, the combined organization will have a diverse and differentiated pipeline with more than 300 products either filed with the FDA or in active stages of development, a foundation for international expansion with select commercial presence in the United Kingdom and Germany, and cost-efficient global manufacturing and development capabilities in all dosage forms. The transaction is expected to enhance the combined organization's competitive position and allow for continued success in an evolving generics market.

*      *      *

The new company will be led by an experienced team with a proven track record in driving strong organic growth and successfully integrating acquisitions. Amneal's Founders and Co-Chief Executive Officers, Chirag Patel and Chintu Patel, will serve as Co-Chairmen of the combined company's Board of Directors. Paul Bisaro, President and Chief Executive Officer of Impax, will serve as Chief Executive Officer of the combined company, and Bryan Reasons, Senior Vice President, Finance and Chief Financial Officer of Impax, will serve as Chief Financial Officer. This leadership team will be supported by the combined company's nearly 6,500 employees operating from strategically positioned locations around the globe.

**Transaction Terms**

Under the terms of the agreement, a new, publicly traded holding company, Amneal Pharmaceuticals, Inc., will be formed. As a result of the transaction, Amneal Holdings members immediately prior to the closing of the transaction will receive non-economic, voting shares of Amneal Pharmaceuticals, Inc. and will be able to exchange, at or following closing, their membership units in Amneal Pharmaceuticals LLC for class A common shares of Amneal Pharmaceuticals, Inc. As a result, Amneal members immediately prior to the closing of the transaction will own approximately 75% of the voting power of Amneal Pharmaceuticals, Inc. and Impax's shareholders immediately prior to the closing of the transaction will own approximately 25% of the voting power of Amneal Pharmaceuticals, Inc. The transaction will be structured as an "Up-C" transaction with a tax receivable agreement split 85% / 15% between Amneal Holdings members and Amneal Pharmaceuticals, Inc., respectively.

In connection with the transaction, the combined company has secured fully committed financing from JPMorgan Chase Bank, N.A. and Bank of America Merrill Lynch to refinance both companies' currently outstanding debt obligations.

**Private Placement**

In connection with the transaction, Amneal Holdings members have entered into definitive purchase agreements with select institutional investors including TPG and funds affiliated with Fidelity Management & Research Company to sell 46.8 million unregistered common shares at $18.25 per share in a private placement for gross proceeds of $855 million, or approximately 15% of fully diluted common shares outstanding on an as converted basis.

*        *        *

**New Company Board of Directors and Headquarters**

The new combined company's Board of Directors is expected to be comprised of 11 members, six of whom will be appointed by Amneal Holdings, including Chirag Patel and Chintu Patel, and five of whom will be appointed by Impax, including Impax Chairman, Bob Burr, who is expected to be appointed lead independent director, and Paul Bisaro. Other members of the Board will be announced in the coming months.

The new combined company will be headquartered in Bridgewater, New Jersey.

**Approvals and Timing**

The transaction agreement has been unanimously approved by the Boards of Directors of Amneal and Impax, and is supported by the management teams of both companies.

The transaction is expected to close in the first half of 2018, subject to the satisfaction of customary closing conditions, including receipt of regulatory approvals and Impax shareholder approval. Amneal Pharmaceuticals received the requisite approval from its members for the transaction.

50.     J.P. Morgan Securities LLC ("J.P. Morgan") acted as financial advisor to Amneal in connection with the Proposed Transaction as well as placement agent to Amneal in connection with the private placement. Latham & Watkins LLP ("Lathan & Watkins") acted as legal counsel for Amneal.

51.     Morgan Stanley & Co. LLC ("Morgan Stanley") acted as financial advisor and Sullivan & Cromwell LLP ("Sullivan & Cromwell") acted as legal counsel for Impax in connection with the Proposed Transaction. Impax also received advice from Bank of America Merrill Lynch.

52.     The Proposed Transaction, as currently contemplated, is unfair to Impax's shareholders, who have not been informed of any definitive offer price, but have been left in the dark as to the true value of this deal.

53.    Plaintiff seeks to enjoin Defendants from proceeding with the Proposed Transaction.

**The Preclusive Devices**

54.    In addition to failing to conduct a fair and reasonable sales process, the Individual Defendants agreed to certain deal protection provisions in the BCA that operate conjunctively to deter other suitors from submitting a superior offer for Impax.

55.    Specifically, pursuant to the BCA, Defendants agreed to: (i) a strict no-solicitation provision that prevents the Company from soliciting other potential acquirers or even continuing discussions and negotiations with potential acquirers; (ii) an information rights provision that requires the Company to disclose the identity of any competing bidder and to furnish Amneal with the terms of any competing bid and confidentiality agreement; and (iii) a matching rights provision which gives Amneal ninety six (96) hours to match any unsolicited superior acquisition proposal the Board receives, which the Board shall be required to provide the identity of the entity or person making such proposal and the material terms thereof. *See* BCA §5.02(a)-(e).[3]

56.    Further, pursuant to the BCA, Defendants agreed to a provision that requires the Company to pay Amneal a termination fee of $45 million, and a provision which may require the Company to reimburse Amneal expenses in connection with entering into the Proposed Transaction in an amount up to $15 million. *See* BCA §8.02.

57.    These deal protection provisions, particularly when considered collectively, substantially and improperly limited the Board's ability to act with respect to investigating and pursuing superior proposals and alternatives, including a sale of all or part of Impax.

58.    Given that the preclusive deal protection provisions in the BCA impede a superior bidder from emerging, it is imperative that Impax's shareholders receive all material information necessary for them to cast a fully informed vote at the shareholder meeting concerning the Proposed Transaction.

**Interests of Certain of the Individual Defendants**

**in the Proposed Transaction Not Shared by Impax's Shareholders**

---

[3] *See* Form S-4, Annex A, filed by Atlas Holdings, Inc. on November 21, 2017, available at https://www.sec.gov/Archives/edgar/data/1723128/000119312517349414/d474326ds4.htm#rom474326_150.

59.   Certain of the Individual Defendants stand to receive benefits not at all shared by other Impax shareholders in the event the Proposed Transaction is consummated.  Certain of the Individual Defendants stand to receive some or all of the following benefits: serving as directors and executive officers of the newly combined company; accelerated vesting of all awards of restricted shares and stock options granted by Impax; enhanced severance based on their employment agreements; accelerated vesting of non-qualified deferred compensation; and continued indemnification related to directors' and officers' liability insurance.

60.   In particular, the Individual Defendants have an aggregate estimated value of unvested equity awards of approximately $12,706,994.

61.   The following table sets forth the number of Impax restricted shares held by each non-employee Board member of Impax (based on price per share of $20.67):

| | Accelerated Vesting of Impax Restricted Shares | |
| --- | --- | --- |
| | Number of Restricted Shares (#) | Estimated Intrinsic Value ($) |
| **Board of Directors** | | |
| Leslie Z. Benet | 4,742 | 98,017 |
| Robert L. Burr | 5,408 | 111,783 |
| Allen Chao | 5,408 | 111,783 |
| Mary K. Pendergast | 5,408 | 111,783 |
| Peter R. Terreri | 5,408 | 111,783 |
| Janet S. Vergis | 5,508 | 113,850 |
| J. Kevin Buchi | 3,281 | 67,818 |

62.   The following table sets forth the number of options held by each non-employee Impax Board member (based on price per share of $20.67):

**FALSE AND MISLEADING STATEMENTS AND/OR**

**MATERIAL OMISSIONS IN THE REGISTRATION STATEMENT**

63.   On November 21, 2017, Atlas filed a registration statement on Form S-4 with the SEC in connection with the Proposed Transaction (the "S-4" or "Registration Statement") containing background information and the financial analyses prepared by Morgan Stanley & Co. LLC ("Morgan Stanley") in support of Morgan Stanley's fairness opinion favoring the Proposed Transaction.

64.     In connection with Morgan Stanley providing a fairness opinion on the Proposed Transaction, Impax agreed to pay Morgan Stanley a fee of $4,000,000 upon delivery of the financial opinion, and an additional $16,000,000 which becomes payable by Impax if the Proposed Transaction is consummated.

65.     The S-4 solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the S-4 before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material false and misleading statements or material misrepresentations or omissions. However, the S-4 misrepresents and/or omits material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

**Financial Projections Prepared by Impax's Management**

66.     The S-4 provides several projections for non-GAAP metrics, including Adjusted EBITDA and Unlevered Free Cash Flow, but fails to disclose necessary line item projections for the metrics used to calculate these non-GAAP measures or otherwise reconcile the non-GAAP projections to the most comparable GAAP measures for the following: (i) Impax Management Projections; (ii) Impax Consensus Projections; (iii) Amneal Adjusted Projections; and (iv) New Amneal Projections, for fiscal years 2017 through 2021.

67.     Failure to provide complete and full disclosure of the line item projections for the metrics used to calculate the above-mentioned non-GAAP metrics leaves Impax shareholders without the necessary, material information to reach a fully-informed decision concerning the Company, fairness of the Merger Consideration, and whether to vote in favor of the Proposed Transaction.

68.     Further, Impax has previously provided its shareholders with the above-mentioned information.  For instance, the following chart is excerpted from Impax's first quarter 2017 press release concerning the Company's financial results:

The following table reconciles reported net loss to adjusted net income:

(Unaudited, In thousands, except per share data)

| | | Three Months Ended March 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | **2017** | | | **2016** |
| Net loss | $ | (98,431) | $ | | (10,408) |
| Adjustment to add (deduct): | | | | | |
| Amortization [a] | | 17,232 | | | 8,768 |
| Non-cash interest expense [b] | | 6,312 | | | 5,305 |
| Business development expenses [c] | | 50 | | | 768 |
| Intangible asset impairment charges [d] | | 45,359 | | | - |
| Reserve for Turing receivable [e] | | 317 | | | 48,043 |
| Turing legal expenses [f] | | (495) | | | - |
| Restructuring and severance charges [g] | | 6,139 | | | 1,568 |
| Loss on debt extinguishment [h] | | 1,215 | | | - |
| Middlesex plant closure [i] | | 1,636 | | | - |
| Other [j] | | 931 | | | 300 |
| Income tax effect [k] | | 27,463 | | | (23,490) |
| Adjusted net income | $ | 7,728 | $ | | 30,854 |
| Adjusted net income per diluted share | $ | 0.11 | $ | | 0.43 |
| Net loss per diluted share | $ | (1.37) | $ | | (0.15) |

69.     The omission of the above-referenced projections and metrics renders the financial projections included on page 89 of the S-4 materially incomplete and misleading.  If a proxy or registration statement soliciting a shareholder vote discloses financial projections and valuation information, such projections must be complete and accurate.

70.     The S-4 also fails to disclose Impax's projections of earnings for years 2018 through 2020,

**Morgan Stanley's Analyses and Fairness Opinion Relating to Impax**

71.     With respect to Morgan Stanley's *Comparable Company Analysis*, the S-4 fails to disclose the criteria used in selecting each comparable company.

72.     The S-4, with respect to Morgan Stanley's *Comparable Company Analysis*, also fails to disclose the following key components used in their analysis: (i) the value per share for the comparable companies and (ii) the equity value of the comparable companies.

73.     With respect to Morgan Stanley's *Precedent Transactions Analysis*, the S-4 fails to disclose: (i) the criteria used to select each of the generic pharmaceuticals transactions since 2011; and (ii) the equity values of each of the selected precedent transactions.

74.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the S-4 fails to disclose the following key components used in their analysis: (i) Impax's terminal exit multiples implied by Morgan Stanley's analysis; (ii) the inputs and assumptions underlying the calculation of the perpetuity growth rates ranging from 0% to 1% used for Impax; (iii) the inputs and assumptions underlying the calculation of the discount rate range of 6.8% to 8.1% used for Impax; (iv) Impax's net debt as of September 30, 2017; and (v) the line item projections used to calculate Impax's unlevered free cash flows for years 2018 through 2021, including EBIT, stock-based compensation expense, depreciation and amortization, and changes in working capital.  *See* S-4 at 95.

75.     These key inputs are material to Impax shareholders, and their omission renders the summary of Morgan Stanley's *Discounted Cash Flow Analyses* materially incomplete and misleading. As the highly-respected Professor Steven M. Davidoff explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation."[4]  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion ***unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the***

[4] Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).

*rationale underlying these choices*. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

76.     In connection with Morgan Stanley's *Equity Research Analysts' Price Targets* review, the S-4 fails to disclose: (i) which equity research analysts Morgan Stanley reviewed and the criteria for using those analysts' price targets; (ii) each analysts' price targets; and (iii) the reasons for only reviewing the limited time period of August 9, 2017 through August 30, 2017.

### Morgan Stanley's Analyses and Fairness Opinion Relating to Amneal

77.     With respect to Morgan Stanley's *Comparable Company Analysis*, the S-4 fails to disclose: (i) how Morgan Stanley determined to review the chosen companies that are in the generic pharmaceuticals and contract drug manufacturing organization space based on "certain similar business and operating characteristics to Amneal" (S-4, at 96); and (ii) the equity values of each comparable company used in determining AV/Adjusted EBITDA CY 2018E.

78.     With respect to Morgan Stanley's *Discounted Cash Flow Analysis*, the S-4 fails to disclose: (i) the reasons or why Morgan Stanley used a range of discount rates of 6.8% to 8.1%; (ii) the line item projections used to calculate Amneal's unlevered free cash flows for years 2018 through 2021, including EBIT, stock-based compensation expense, depreciation and amortization, changes in working capital, and milestone payments; Amneal's net debt as of September 30, 2017; and (iv) the terminal exit multiples implied by Morgan Stanley's analysis.

### Conflicts of Interest

79.     The S-4 discloses that only Morgan Stanley provided services and advice to Impax in connection with the Proposed Transaction.  However, the joint press release issued by Impax and Amneal announcing the Proposed Transaction states that "Morgan Stanley is serving as financial advisor to Impax…In addition, Impax received advice from BofA Merrill Lynch."  Amneal also entered into a commitment letter with JPMorgan Chase Bank, Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, and RBC Capital Markets (the "Debt Commitment Letter") to provide debt financing to refinance both companies' currently outstanding debt obligations.

80.   The S-4 fails to disclose material information relating to BofA Merrill Lynch's potential conflicts of interest, including: (i) the fact that Bank of America Merrill Lynch provided advice to Impax in connection with the Proposed Transaction; (ii) the timing and nature of the advice provided to Impax; (iii) the amount of compensation, if any, Bank of America Merrill Lynch earned or is expected to earn for providing advice and financing in connection with the Proposed Transaction; and (iv) whether Bank of America Merrill Lynch has provided any advisory or other financial services to Impax, Amneal, or their affiliates in the past and, if so, the amount of compensation earned in connection with those services.

### **Background of the Proposed Transaction**

81.   The S-4 omits material information concerning the background of the Proposed Transaction and the process the Board conducted before it agreed to enter into the BCA.

82.   The S-4 fails to disclose: (i) the terms of the confidentiality agreements the Company entered into in June 2017 with three parties that expressed an interest in strategic transaction with the Company, including whether they contain a standstill and/or "don't ask, don't waive" ("DADW") provision; (ii) what the "business development opportunities" were that the S-4 states defendant Bisaro discussed with certain members of the Board on or about April 6, 2017 and the reason the Board determined not to pursue those potential opportunities; and (iii) the Board's reasons for declining to pursue a sales process to attempt to maximize stockholder value, which was discussed at a Board meeting held on September 11, 2017.

83.   The omission of this material information renders the Background of the Combination section of the Registration Statement false and misleading.

### **CLASS ACTION ALLEGATIONS**

84.   Plaintiff, a shareholder in the Company, brings this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and all shareholders of Impax (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

85.   This action is properly maintainable as a class action.

86.    A class action is superior to other available methods of fair and efficient adjudication of this controversy.

87.    The Class is so numerous that joinder of all members is impracticable.  As of October 27, 2017, Impax had approximately 74,113,674 shares of common stock outstanding.  Consequently, the number of Class members is believed to be in the hundreds or thousands and are likely scattered across the United States.

88.    There are questions of law and fact that are common to all Class members that predominate over any questions affecting only individuals, including, but not limited to:

  a)    whether Defendants have misrepresented or omitted material information concerning the Proposed Transaction in the S-4 in violation of Section 14(a) of the Exchange Act;

  b)    whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

  c)    whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading S-4.

89.    Plaintiff's claims and defenses are typical of the claims and defenses of other Class members and Plaintiff has no interests that are antagonistic or adverse to the interest of other Class members.  Plaintiff will fairly and adequately protect the interests of the Class.

90.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

91.    Defendants have acted in a manner that affects Plaintiff and all members of the Class alike, thereby making appropriate injunctive relief and/or corresponding declaratory relief with respect to the Class as a whole.

92.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants; or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members or substantially impair or impede their ability to protect their interests.

**COUNT I**

**(Against All Defendants for Violations of Section 14(a)**

**of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

93.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

95.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

96.     The Defendants have issued the S-4 with the intention of soliciting stockholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the S-4, which fails to provide critical information regarding, among other things, the financial projections for the Company and the fairness opinion of Impax's financial advisor, Morgan Stanley.

97.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the S-4, but nonetheless failed to obtain and disclose such information to stockholders although they could have done so without extraordinary effort.

98.    The Defendants knew or were negligent in not knowing that the S-4 is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

99.    The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the S-4, rendering the sections of the S-4 identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the S-4 and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

100.    The Defendants were, at the very least, negligent in preparing and reviewing the S-4. The preparation of a registration statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the S-4 or failing to notice the material omissions in the S-4 upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the BCA and the preparation of the Company's financial projections.

101.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

102.    Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**COUNT II**

**(Against the Individual Defendants for**

**Violations of Section 20(a) of the Exchange Act)**

103.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

104.    The Individual Defendants acted as controlling persons of Impax within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or

directors of Impax, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the S-4 filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

105.   Each of the Individual Defendants was provided with, or had unlimited access to, copies of the S-4 and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

107.   In addition, as set forth in the S-4 sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the BCA.  The S-4 purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

108.   By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

109.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

110.   Plaintiff and the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with the stockholders vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the S-4;

C. Directing the Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated:      December 14, 2017          **REICH RADCLIFFE & HOOVER LLP**
                                       By: /s/ Adam T. Hoover
                                       Adam T. Hoover

                                       **LIFSHITZ & MILLER**
                                       Edward Miller
                                       Attorneys for Plaintiff

## SWORN CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

I, David Stone, hereby certify that:

1.  Plaintiff has reviewed the complaint and authorized the commencement of a lead plaintiff motion and/or filing of a complaint on plaintiff's behalf.

2.  I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in IPXL securities that are the subject of this litigation during the Class Period are attached hereto as Exhibit A.

5.  I have not served as or sought to serve as a representative party on behalf of a Class under this title during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Executed on 12/05/2017

Signature

**Exhibit A**

My transactions in Impax Laboratories, Inc. (IXPL) securities that are the subject of this litigation during the class period set forth in the complaint are as follows ("P" indicates a purchase, "S" indicates a sale):

| Security | Date | Sale | Purchase | Number of Shares | Price per Share |
|----------|------|------|----------|------------------|-----------------|
| IPXL | 2015-10-02 | | P | 270 | $33.50 |